# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

PHYLLIS HANEY,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. C05-2059

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On October 27, 2005, the parties have consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 10). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Phyllis Haney applied for Disability Insurance Benefits and Supplemental Security Income benefits on April 3, 2002, alleging an inability to work since October 31, 1994 (Tr. 56-59). Ms. Haney's application was originally denied (Tr. 34-38), and denied again on reconsideration (Tr. 41-44). A hearing before Administrative Law Judge ("ALJ") John P. Johnson was held on November 3, 2004 (Tr. 309-50). The ALJ denied Ms. Haney's appeal in a decision dated January 26, 2005 (Tr. 15-23). The Appeals Council denied Ms. Haney's request for review on May 19, 2005 (Tr. 6-8). This action for judicial review was filed on July 26, 2005.

## II. FACTUAL BACKGROUND

### A. Medical History

Ms. Haney filed previous applications for benefits on January 20, 1994, on January 16, 1996, and again on May 15, 1996, all of which were denied (Tr. 15). As no subsequent application was filed within a two year period from the last registered filing, there is no issue as to reopening and the first relevant record date for consideration in this case is April, 3, 2002 (Tr. 16).

On March 25, 2002, Dr. Kerri Husman conducted a psychiatric intake evaluation of Ms. Haney's depressive symptoms at the Mid-Eastern Iowa Community Mental Health Center ("CMHC") (Tr. 141-43). Ms. Haney claimed that she has suffered from depression and mood swings on and off for years, hears voices, experiences night sweats, has difficulty tolerating crowds, and battles circulation problems (Tr. 141-42). Ms. Haney stated that she feels herself "capable of working but just can't find anything and believes that her anxiety symptoms and uncomfortable nature in social settings limits her ability to find work" (Tr. 142). Dr. Husman noted in her report that Ms. Haney appeared alert and oriented during the mental exam, but irritable, defensive and dysphoric, particularly when answering family-related questions (Tr. 143). Dr. Husman concluded that Ms. Haney suffers from "major depressive disorder with probable superimposed dysthymia" and offered an overall GAF score of 50 (Tr. 143). Dr. Husman suggested that Ms. Haney continue with Prozac and try Trazodone as needed for sleep (Tr. 143). Ms. Haney was released with follow-up care instructions and a referral for therapy (Tr. 143).

On April 15, 2002, Ms. Haney was seen as an outpatient at the University of Iowa Hospitals and Clinics ("UIHC") for follow-up to laboratory evaluations performed in December of 2001 (Tr. 145, 177-80). The prior lab tests were conducted to assess alleged intermittent numbness and tingling of Ms. Haney's left fingers and toes (Tr. 145). Both her TSH level and neurology exam were normal (Tr. 145). The current physical exam

showed "normal strength and tone of her upper and lower extremities with full range of motion in her joints" (Tr. 145).

In her April 29, 2002 progress note, Dr. Husman reduced the dosage of Trazodone to 50 mg to alleviate symptoms of sluggishness in the morning and suggested that Ms. Haney continue on Prozac and follow up in one month (Tr. 214). Ms. Haney reported continued anxiety/discomfort in crowds and nightmares involving babies, but no longer heard babies crying (Tr. 214). She admitted to actively looking for work and hoped "to get a job soon at the Sheraton Inn cleaning rooms after hours" (Tr. 214). Dr. Husman noted that Ms. Haney exhibited no evidence of suicidal ideation or psychotic symptoms and despite a somewhat disorganized thought process, Dr. Husman deemed Ms. Haney's insight and judgment to be fair (Tr. 214). Ms. Haney received a GAF score of 53 (Tr. 214).

On May 6, 2002, Ms. Haney visited the CMHC for a psychotherapy intake assessment (Tr. 206-08). Jennifer Kruse, M.A., evaluated Ms. Haney who complained of low energy, tension headaches, nightmares, and hearing babies cry at times (Tr. 206). Ms. Haney admitted that she did not always take her prescribed medications but that her husband makes her (Tr. 206). Ms. Kruse described Ms. Haney's current clinical status as moody and lacking concentration with an overall GAF of 50 (Tr. 207).

From May through November of 2002, Ms. Kruse saw Ms. Haney off and on for pscyhotherapy follow-up (Tr. 200-05). Ms. Kruse's progress notes from her sessions with Ms. Haney report conversations about how to manage anger, bereavement, anxiety, and mood swings (Tr. 200-05).

On May 30, 2002, Dr. Laurie Hall conducted a psychological evaluation of Ms. Haney (Tr. 191-92). Ms. Haney reported suffering from left-sided tingling/numbness, aggression issues, social isolation, auditory hallucinations of babies crying after two miscarriages, and depression (Tr. 191). Dr. Hall described how Ms. Haney "cooperated minimally with the examination" and refused to perform several

tasks because she thought herself incapable of completing the tasks (Tr. 191). Dr. Hall concluded that Ms. Haney is both illiterate and mildly retarded (Tr. 191).

> She has limited ability to remember and understand instructions, procedures and locations. She is unable to maintain attention, concentration and pace. She is not capable of interacting appropriately with coworkers, supervisors or the public. She evidences social phobia symptoms. Her judgment and insight are poor. She is not capable of managing finances on her own.

(Tr. 191). Dr. Hall ultimately diagnosed Ms. Haney as having major depressive disorder with psychotic features, social phobia, and offered a GAF score of 50 (Tr. 192).

Dr. Thomas Nicknish of Towncrest Internal Medicine, L.L.P. sent a letter to the DSS on June 11, 2002 regarding his physical examination of Ms. Haney on June 5, 2002 (Tr. 193-94). According to Dr. Nicknish, the physical exam was normal and the neurological exam was intact (Tr. 194). He concluded that Ms. Haney suffered from depression and a history of asthma (Tr. 194).

On June 24, 2002, Ms. Haney sought treatment from Jennifer Zaichenko, a Certified Physician Assistant specializing in adult psychiatry (Tr. 213). Ms. Haney complained of continued restless sleep and night sweats (Tr. 213). Despite Ms. Haney's general anger towards physicians and a reported verbal confrontation with a female neighbor thought to have a crush on Ms. Haney's husband, Ms. Haney indicated that "for the most part Prozac has been effective for her depressive symptoms [] other than some situational anger and mild anxiety" (Tr. 213). Ms. Zaichenko noted that Ms. Haney failed to exhibit evidence of lethality, anxiety, or psychosis (Tr. 213). Ms. Haney was urged to switch medications from Prozac to Celexa due to cost concerns because Celexa was more readily available in sample form at the Center (Tr. 213).

Dr. Hall conducted a secondary psychological evaluation on July 22, 2002 to assess Ms. Haney's intellectual capabilities (Tr. 197-99). Dr. Hall noted that Ms. Haney did not cooperate or put forth much effort during the exam, was argumentative, and repeatedly

threatened to leave (Tr. 197). Ms. Haney demonstrated an "extremely low IQ score" as evidenced by her component Verbal IQ score of 52 and Performance IQ score of 48 (Tr. 198). Dr. Hall concluded that Ms. Haney may be more accurately described as an illiterate adult female that "appears to function in the range of mild mental retardation" (Tr. 198). According to Dr. Hall, Ms. Haney's exam results may underestimate her abilities due to minimal cooperation and effort during the tests coupled with a suspicion that Ms. Haney made some purposeful errors[1] (Tr. 197). Dr. Hall's complete diagnosis included Major Depressive Disorder with severe psychotic features, Social Phobia, Personality Disorder, Alcohol/Cocaine Abuse in full remission, and asthma (Tr. 198).

According to Ms. Zaichenko's progress note of August 13, 2002, Ms. Haney complained of sleeplessness and anxiety in her husband's absence as he left town to care for his own ailing mother (Tr. 211). Ms. Zaichenko noted that Ms. Haney's psychomotor activity appeared normal and that her affect improved by the end of the session (Tr. 211). Ms. Zaichenko suggested continued therapy with Ms. Kruse and a change in sleep aid to Sonata 10 mg (Tr. 211).

Dr. Lon Olsen performed a Mental Residual Functional Capacity Assessment for Ms. Haney on September 18, 2002 (Tr. 252-53). Dr. Olsen opined that Ms. Haney does suffer from an MDI, but it would not preclude her from working (Tr. 252). Dr. Olsen reported that Ms. Haney remains independent for self-care needs, continues to perform a host of daily activities, and conducts superficial social interaction (Tr. 252). Dr. Olsen concluded that

> She would have some difficulty understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, working near others

---

[1] During the Matrix Reasoning portion of the exam, Ms. Haney correctly answered sample questions on the first try but then proceeded to get the first four questions wrong (Tr. 197). She also seemed to "purposefully misorder" certain digits (Tr. 197).

> without distracting them or being distracted by them, interacting appropriately with the public, and responding appropriately to criticism from supervisors. She would be capable of activities that did not require attention to detail, sustained vigilance, extensive contact with co-workers or the public, or intense supervisory oversight.

(Tr. 253).

On September 19, 2002, Ms. Haney presented herself voluntarily at the Mercy Hospital Emergency Room in Iowa City after drinking two beers, a shot of liquor, and becoming afraid that she might injure herself (Tr. 299, 301). Ms. Haney had a history of alcoholism and alleged suicidal thoughts after breaking eight months of sobriety (Tr. 299). Ms. Haney was admitted over night but self-stabilized well and when interviewed in the morning, she exhibited "a full range of affect, neutral mood, no evidence of any psychosis, and when directly asked, she denied having any suicidal or homicidal thought or plan" (Tr. 299). The staff psychiatrist, Dr. Robert Wesner, discharged her the next morning as stable with normal mental health (Tr. 299). Dr. Wesner did set up a follow-up appointment for therapy with Ms. Zaichenko (Tr. 300).

On September 25, 2002, Dr. J.D. Wilson, a DSS medical consultant, reviewed Ms. Maheny's file and determined that she "does not have a severe physical impairment to keep her from working" (Tr. 215). Upon physical examination, Ms. Haney demonstrated full muscle control and no evidence of nerve damage (Tr. 215). Ms. Haney never sought treatment for headaches despite claims of experiencing them daily and seems to manage her asthma with an inhaler (Tr. 215).

In a progress note on October 16, 2002, Ms. Zaichenko suggested that Ms. Haney switch medications from Celexa to Lexapro because more samples were available for distribution from the Center and increase the dosage to 10 mg (Tr. 210). Ms. Zaichenko prescribed Sonata as a sleep aid and scheduled Ms. Haney to return as a followup to the medication change (Tr. 210).

Ms. Kruse completed two checklist Medical Source Statements on November 15, 2002, suggesting that Ms. Haney suffered from depression and affective disorders (Tr. 216-26). Ms. Kruse determined that Ms. Haney displayed "moderate" or "marked" impairments in several categories which either significantly affect, but do not preclude the ability to function, or severely affect the ability to function (Tr. 217). Ms. Kruse opined that Ms. Haney is moderately impaired in these areas: (1) remembering/understanding/carrying out detailed instructions; (2) maintaining attention/concentration for protracted periods of time; (3) performing activities within a schedule, maintaining attendance, and being punctual; (4) asking questions or requesting assistance; (5) maintaining socially acceptable behavior; and (6) responding appropriately to changes in the work setting (Tr. 216-19). Ms. Kruse further opined that Ms. Haney demonstrates marked impairments in these categories: (1) the ability to finish a workday without interruption from psychological symptoms and perform as a steady pace without unreasonable breaks; (2) the ability to interact appropriately with the general public; (3) the ability to accept instructions and respond accordingly to constructive criticism; and (4) the ability to get along with peers/coworkers without exhibiting behavioral extremes (Tr. 218-19).

The second medical source statement that Ms. Kruse completed consisted of a checklist form asking whether certain symptoms/behaviors are "present" or "absent" upon which Ms. Kruse could then make a determination about Ms. Haney's mental limitations (Tr. 221-26). Ms. Kruse noted that Ms. Haney suffers from depression as characterized by a pervasive loss of interest in activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking (Tr. 222). Ms. Kruse further reported marked restrictions of daily activities and marked difficulties in maintaining social functioning (Tr. 224). Ms. Kruse also opined that Ms. Haney suffered from a history of a chronic affective disorder lasting longer than two years that "has caused more than a minimal

limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" (Tr. 225).

On November 22, 2002, and on November 27, 2002, Ms. Zaichenko completed Medical Source Statements suggesting that Ms. Haney suffers from anxiety and a personality disorder, respectively (Tr. 227-33). Ms. Zaichenko described Ms. Haney as exhibiting the following signs symptomatic of generalized persistent anxiety: motor tension, apprehensive expectation, and vigilance/scanning (Tr. 227-28). Ms. Zaichenko further reported evidence of persistent irrational fears resulting in avoidance as well as recurrent obsessions, compulsions, and intrusive recollections of a traumatic experience (Tr. 228). Ms. Zaichenko opined that Ms. Haney demonstrates marked limitations in her daily activities and maintaining social functioning, concentration, persistence, or pace (Tr. 229).

Ms. Zaichenko further determined that Ms. Haney exhibits deeply ingrained, maladaptive behavioral patterns associated with seclusiveness, hostility, mood disturbances, pathological dependence/aggressivity, intensely unstable interpersonal relationships and impulsive/damaging behavior (Tr. 232). These signs of personality disorder also contributed to Ms. Haney's marked restrictions of daily activities and difficulties in maintaining social functioning, according to Ms. Zaichenko (Tr. 232).

Ms. Haney visited Debra Estes, LISW, at the Black Hawk-Grundy Mental Health Center, Inc. ("BHGMHC") for thirty-minute individual psychotherapy sessions in January and February of 2004 (Tr. 266-67, 263). Ms. Haney complained of claustrophobia, low stress tolerance, anxiety, mood swings, and depression (Tr. 266). As an example of Ms. Haney's alleged difficulties with crowds and social interaction in general, Ms. Estes notes in a January 20, 2004 progress report that Ms. Haney could not tolerate a large family gathering and had to "go off into a room by herself" (Tr. 266). Ms. Haney further reported difficulty sleeping and stomach upset in the wake of her neighbor's sudden death (Tr. 267). At no time did Ms. Estes find any "evidence that [Ms. Haney] would be a risk

of harm to self or others" (Tr. 266, 263). In a March 18, 2004 progress report, Ms. Estes indicates that Ms. Haney had refused to take her medications for approximately one week and urged that Ms. Haney continue with her prescription medications (Tr. 263). Follow-up treatment with Ms. Estes and the Clinic psychiatrist was suggested (Tr. 266-67, 63).

In a letter dated March 19, 2004 to Ms. Haney's attorney, three BHGMHC staff members opined that Ms. Haney suffers from severe conditions that make it "highly unlikely that she would be able to successfully engage in gainful employment" (Tr. 262). Debra Estes, LISW, Cyd Grafft, ARNP, and Dr. Marvin Piburn, MD, concurred that Ms. Haney is markedly limited in her daily activities, social functioning, and possesses a very low stress tolerance in social scenarios due to both depression and anxiety (Tr. 262). As a result, these three medical staff members concluded that Ms. Haney's ability to remember/carry out instructions, maintain attention/concentration, and interact appropriately with co-workers/supervisors would be severely impaired (Tr. 262).

On December 4, 2004, Ms. Estes met with Ms. Haney to conduct a mental status exam (Tr. 279-84). Dr. Paul Samo, a psychiatrist, co-signed Ms. Estes' medical conclusions regarding Ms. Haney's mental health (Tr. 284). Ms. Estes described Ms. Haney's mood during the exam as depressed, angry, and anxious and estimated Ms. Haney's intellectual functioning as low, but regarded Ms. Haney's judgment and insight to be fair (Tr. 282). Ms. Estes determined clinically that Ms. Haney exhibited a history of depression and anxiety for which Ms. Haney received only sporadic follow-up therapy (Tr. 283). Ms. Estes recommended continued medication and therapy, anticipating that Ms. Haney would require "long term involvement" (Tr. 284). The diagnostic conclusions were as follows: (1) major depressive disorder with psychotic features; (2) post-traumatic stress disorder; (3) learning disorder NOS; (4) personality disorder NOS; (5) asthma; and (6) circulation problems (Tr. 285).

On January 19, 2005, Dr. Paul Samo of BHGMHC conducted a mental status exam on Ms. Haney (Tr. 293-94). Ms. Haney reported feeling depressed, anxious while

driving/riding in a car that leads to brief anxiety attacks, sleeplessness, and hearing babies' voices at times (Tr. 293). Ms. Haney admitted that her medicines help somewhat (Tr. 293). Dr. Samo indicated that Ms. Haney presented herself as alert, pleasant, dressed casually and demonstrating good eye contact (Tr. 293). Dr. Samo diagnosed Ms. Haney with major depressive disorder; panic disorder with agorraphobia; PTSD; and a history of alcohol abuse in remission (Tr. 294). He prescribed Lexapro and Seroquel with instructions to follow-up in four weeks (Tr. 294).

On March 24, 2005. Dr. Samo again saw Ms. Haney at which time she stated that she had been recently hospitalized for 3 days due to suicidal thoughts of "jumping into the river" (Tr. 292). Ms. Haney further reported having a panic attack at a store that caused her to sit down and then leave the premises (Tr. 292). Her meds were not changed, however, and Ms. Haney stated that she felt the medications do help (Tr. 292). Although she complained of mood swings, crying spells, and social isolation, Dr. Samo noted that Ms. Haney's self esteem appeared "a little better" (Tr. at 292). He increased the Lexapro and Seroquel dosages with instructions to follow up in 4-5 weeks and to continue therapy sessions with Ms. Estes (Tr. 292).

## B.  Plaintiff's Subjective Complaints

On May 15, 2002, Ms. Haney completed a personal pain/fatigue questionnaire (Tr. 99-102). She claims that her pain varies throughout the day and is concentrated in her back and legs due to poor circulation (Tr. 99). Certain movements and cold weather worsen her pain (Tr. 99). Ms. Haney takes aspirin every three to four hours, which she claims helps, but is not curative (Tr. 100). Outside of hot baths, Ms. Haney does not engage in rehab or other treatment regimens to control pain (Tr. 100). Ms. Haney claims that she is restricted in working, lifting, and standing (Tr. 100). She states that the pain contributes to her sleepless nights, but has experienced no change in weight as a result (Tr. 101). Ms. Haney admits that her pain and fatigue have not caused her difficulties to care for her personal needs or limited the use of her hands/arms (Tr. 101). Ms. Haney

states that her pain and fatigue have affected her ability to concentrate and think (Tr. 101). Ms. Haney claims that she is limited to walking two blocks before resting and standing no more than thirty minutes at a time (Tr. 102). Ms. Haney further states that a typical day consists of making the bed and washing dishes (Tr. 102).

On May 18, 2002, Mr. Michael Haney completed a Third Party Daily Activities Questionnaire, describing his wife's habits and abilities (Tr. 81-84). Mr. Haney claims that his wife sleeps eight hours per night when taking her medication (Tr. 81). Mr. Haney noted that Ms. Haney has no difficulties completing chores when reminded and can sometimes find her way around unfamiliar areas when using public transportation alone (Tr. 82). Mr. Haney described how she likes to take walks and reads newspapers sometimes daily (Tr. 83). As long as she was able to work by herself, Ms. Haney got along adequately with her prior employers and co-workers, according to Mr. Haney (Tr. 83). Mr. Haney notes that his wife at times has difficulties following directions or completing a chore but can pay bills and manage money effectively when he assists (Tr. 84). Mr. Haney claims that his wife is very depressed, hears voices sometimes, and experiences a mood change every two to three days (Tr. 84).

On May 18, 2002, Mr. Michael Haney also completed a Third Party Adult Adaptive Functioning Questionnaire wherein he described his wife as never or rarely doing the following: take out garbage; initiate conversations; have long-term friends; offer help to others; locate an unfamiliar place given an address or directions; use the public library; stay on task; use a thermometer; manage stress well; attend leisure activities outside the home; engage in recreation with others; plan ahead for leisure activities; or invite others to partake in a leisure activity (Tr. 85-89). Mr. Haney further described his wife as incapable of doing the following: use the computer/internet.; make simple household repairs; care for supplies/equipment; balance a checkbook; use a calculator; take a turn in games/sports; or play by the rules in games/sports/fun activities (Tr. 85-89). Mr. Haney

describes housekeeping where she can work alone as evidence of Ms. Haney's work-related personal strengths (Tr. 90).

On May 23, 2002, Ms. Haney completed a Daily Activities Questionnaire with the help of her husband (Tr. 103-06). Therein she states that she lives in a apartment only with her husband and takes care of all self needs without assistance (Tr. 103). Ms. Haney claims that she has difficulties sleeping in large part due to auditory hallucinations of babies crying (Tr. 103). She states that she continues to do laundry, dishes, change sheets, and vacuum regularly (Tr. 103). She further states that she rarely takes out trash and never did a range of other household chores including, but not limited to, home repairs and garden work (Tr. 103). Ms. Haney claims that she shares cooking responsibilities with her husband and often shops together with him (Tr. 104).

Ms. Haney does not drive or possess a valid license and can use public transportation unassisted, but claims that she has difficulties orienting herself in unfamiliar areas (Tr. 104). Ms. Haney asserts that she does not need help or reminders to take her medications (Tr. 104). Ms. Haney's recreational activities include taking walks, watching television, and reading on a daily basis (Tr. 105). Although she visits with relatives, Ms. Haney states that she is uncomfortable in crowds (Tr. 105). Outside of attending church and doctor appointments, Ms. Haney claims that she does not participate in any groups and rarely gets involved socially (Tr. 105). Ms. Haney alleges that she sometimes cannot get along with others, becomes very agitated when others point out her mistakes, and that she worked adequately with former colleagues when permitted to work alone (Tr. 105). Ms. Haney claims that she sometimes has problems concentrating or remembering and that new people and surroundings stress her out (Tr. 106). She states that she usually reacts "very badly" in stressful situations (Tr. 106). Ms. Haney further claims that she often has trouble following directions and sometimes cannot complete a task (Tr. 106). Ms. Haney claims that she can pay bills and manage finances with the help of her husband (Tr. 106).

On November 4, 2002, Ms. Haney completed a secondary pain/fatigue questionnaire still complaining of pain in her back and legs (Tr. 111). She claims that her pain is now worse in the mornings and evenings and occurs on and off daily in fifteen to twenty minute intervals (Tr. 111). Reaching and bending in addition to cold weather cause her pain (Tr. 111). She further states that her back pain at times radiates into the back of her head and has gotten markedly worse over the past year (Tr. 111). Ms. Haney continues to take aspirin for her pain and states that "Doctors have not really given me anything" (Tr. 112). She states that she does not undergo vocational rehabilitation because there is "a year long waiting list" and only sees someone regarding her mental health (Tr. 112). Ms. Haney now claims that she has had to restrict or stop "all activities" in light of her pain and fatigue (Tr. 112). Ms. Haney cannot get a full night of sleep and reports getting only "5-6 hours" of rest per night (Tr. 113). Although she claims her self care needs remain unaffected, Ms. Haney now asserts that she is limited in the use of her arms/hands to lifting items between fifteen and twenty-five pounds, buttoning clothes, and tying shoes (Tr. 113). Ms. Haney now describes that her typical day consists of "dusting, making beds, and washing dishes" (Tr. 114).

On November 28, 2004, Ms. Haney completed a secondary daily activities questionnaire with the help of her husband (Tr. 115-18). Ms. Haney claims to sleep on and off throughout the day and night due to poor circulation, pain, and hearing voices (Tr. 115). Due to alleged difficulties lifting items, Ms. Haney states that her husband does all ironing, taking out trash, and the most vacuuming (Tr. 115). Ms. Haney now claims that she experiences limiting side effects from medications such as the jitters and mood swings (Tr. 116). She states she has no hobbies and that she does not read at all "because I don't really read that good" (Tr. 117). Outside of the occasional family gathering, Ms. Haney does not go out much in public and avoids large crowds (Tr. 117). Ms. Haney now describes her interaction with former colleagues/supervisors as very poor because she doesn't take orders well and hates when other stand over her (Tr. 117). Ms. Haney now

alleges that she has problems remembering and concentrating much of the time and has to be retold to do things several times which makes her angry and combative (Tr. 118). Ms. Haney states that she can no longer handle money or the bills and that her husband must do it (Tr. 118). She further asserted that she was "slow in school" which made her very upset and urged her to drop out (Tr. 118).

### C. Hearing Testimony

Ms. Haney was born on November 11, 1964 and last worked at Motel 6 as a housekeeper for approximately two months (Tr. 314). Ms. Haney testified that she stopped working at Motel 6 due to stomach problems for which she was hospitalized (Tr. 315). Ms. Haney formerly worked at Goodwill as a can line operator for approximately three months until she allegedly developed difficulties standing (Tr. 315).

Ms. Haney went to high school through the eleventh grade but did not finish or obtain a GED (Tr. 316). Upon examination by the ALJ, Ms. Haney indicated that she did attend regular (not special education) classes, but "wasn't too smart" (Tr. 324). She testified to receiving food stamps and denied the past use of street drugs (Tr. 329). She claims that she has never had a driver's license and gets around by walking, though "not too far," or gets a ride from a relative or neighbor (Tr. 324). Ms. Haney testified that she sees a psychiatrist at Black Hawk Mental Health for treatment of her depression every two weeks and is currently taking Trazodone and Lasopril prescription medications (Tr. 316, 326).

Ms. Haney claimed that she keeps to herself when feeling depressed, normally sits around the house and watches television, and only sometimes ventures out in public (Tr. 317). Ms. Haney further testified that she avoids large crowds and does not go out unaccompanied or she will get panicky due to claustrophobia and anxiety (Tr. 317). Ms. Haney claimed to hear babies crying since her miscarriages (317-18). Ms. Haney affirmed that she has difficulties getting along with people generally and often becomes

angry and argumentative with doctors and her husband (Tr. 318). She claimed to have used profanity and thrown objects in the past when agitated (Tr. 319).

Ms. Haney claims that her memory is so poor that she cannot even remember her own age at times (Tr. 319). Ms. Haney testified that she is slow and "doesn't understand too good" which affects her concentration and memory of instructions, particularly from physicians (Tr. 320). She further testified that her husband generally speaks to others on her behalf and that she doesn't read ever, even newspapers (Tr. 320). Ms. Haney testified that she suffers from back problems that stem from a 1992 car accident such that she does not walk much anymore or do any lifting (Tr. 321). Ms. Haney claims to take one to two of her husband's Naproxen tablets daily, but is not prescribed any pain medications for her back (Tr. 322). Although instructed to undergo an MRI, Ms. Haney claims she cannot because of her claustrophobia (Tr. 322).

Ms. Haney testified that she can stand just long enough to wash a "few dishes" and has problems bending, stooping, squatting, climbing, and gripping due to her bad back and poor circulation (Tr. 326-27). Ms. Haney claimed to see a People's Clinic physician for her back problems when she undergoes a monthly physical upon receiving her birth control injection (Tr. 327). Although she stated she has no problems sitting, Ms. Haney remarked that she cannot follow along with the television programs that she watches daily (Tr. 328). Ms. Haney further testified that she can longer skate, has no current hobbies, belongs to no organization, and performs no regular house chores as her husband does the cooking and cleaning (Tr. 330-31).

At the hearing, Mr. Michael Haney testified that his wife spends her days watching "TV, sleeping, and looking out the window" (Tr. 332). He claimed that he talks for his wife, gets instructions from doctors and explains them to Ms. Haney, fills her prescriptions, and pays her bills (Tr. 332-33). He further claimed that his wife cannot read or count and often refuses to take her medications (Tr. 333). Mr. Haney asserted that his wife had consistent problems with former supervisors and coworkers (Tr. 334).

Mr. Haney claimed that his wife often forgets what he tells her shortly thereafter and will not go anywhere unaccompanied because she distrusts people (Tr. 335). He admitted that Ms. Haney has trouble lifting things heavier than a bed cover, often fails to complete household chores like folding the laundry, and no longer does any cooking (Tr. 335-36). Mr. Haney testified that he rubs her legs and feet when Ms. Haney complains of circulatory numbness and accompanies Ms. Haney to all doctor appointments (Tr. 336). He further claimed that she avoids the highway because she fears traffic and becomes anxious (Tr. 337).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987).  Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

#### B.  ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process.  See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.   If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.   If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.3d 812, 815 (8th Cir. 1993)).  If the claimant meets the burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with

the claimant's impairments and vocational factors such as age, education, and work experience.  Id.

Under the first step of the analysis, the ALJ found that Ms. Haney had not engaged in substantial gainful activity since her disability application date (Tr. 16).  At the second step, the ALJ determined that Ms. Haney's depression, social phobia, personality disorder, polysubstance abuse history, back pain, and left sided leg/arm numbness, constitute severe impairments (Tr. 16).  At the third step, the ALJ determined that Ms. Haney's impairments did not meet or equal one of the listed impairments (Tr. 16).  At the fourth and fifth steps, the ALJ determined that Ms. Haney has the residual functional capacity to perform a full range of unskilled work and therefore was not "disabled" (Tr. 21).

### C.  Credibility Determination

Ms. Haney claims that the ALJ failed to evaluate Ms. Haney's credibility according to the Polaski standard.   See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Ms. Haney argues that her subjective allegations of pain and fatigue are inconsistent with the ability to perform competitive employment, and are consistent with both the medical records generally and with the opinions of Ms. Haney's treating sources.  According to Ms. Haney, the ALJ failed to failed to identify inconsistencies in the record as a whole or adequately explain them in discrediting her subjective complaints.  Specifically, Ms. Haney contends that as a result of the combined effects of her mental impairments, she does not have the ability to perform competitive employment, and that inability is consistent both with the medical evidence and with the record as a whole.

The Commissioner argues that the ALJ properly evaluated Ms. Haney's credibility, and is consistent with the standard for evaluating pain and other subjective complaints set forth in Polaski. The Commissioner describes in detail Ms. Haney's medical record and alleged daily living restrictions, and argues that the accumulation of contradicted statements, unsupported allegations, and general inconsistencies forms a sufficient basis

upon which the ALJ could determine that Ms. Haney's complaints of disabling mental conditions, pain and fatigue were not credible.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22.

Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). "A claimant need not prove that he or she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). See also Keller v. Shalala, 26 F.3d 856, 859 (8th Cir. 1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and out, in the sometimes competitive and stressful conditions in which real people work in the real world.'") (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard complaints "solely because the objective medical evidence does not fully support them." Polaski, 739 F.2d at 1322.

However, where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). In evaluating Ms. Haney's credibility, the ALJ fulfilled his obligation to make express credibility determinations and to set forth the inconsistencies in the record which caused him to reject the subjective complaints. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th. Cir. 2004). The ALJ need only acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints. Id.

The court finds ample inconsistencies in the record as a whole to support the ALJ's credibility determination. Ms. Haney denied any history of special education when applying for benefits, but claimed during various physician consultations that she was placed in special ed classes throughout her school years. Ms. Haney further stated on her application that she completed the eleventh grade and could read and write, but led Dr. Hall to conclude that she was illiterate during a mental evaluation. Ms. Haney reported in her first Daily Activities Questionnaire that she daily reads portions of a newspaper but claimed that she does not read at all in a second such Activities Questionnaire completed some six months later. Although Ms. Haney claimed that she "couldn't count" during the first consultative exam with Dr. Hall, an allegation that her husband attested to at the ALJ hearing, Mr. Haney reported in his Third Party Questionnaire that she could effectively manage money. Contrary to Ms. Haney's claim never to leave home for a doctor's appointment unattended, Ms. Haney arrived on time and without assistance to her second consultative psychological exam as well as to follow up appointments with Ms. Zaichenko and Ms. Kruse. Despite multiple complaints of left sided numbness on several occasions to different physicians, actual neurological tests conducted in 2002 were normal. Furthermore, Ms. Haney reported that she takes care of all self needs, can use public transportation alone, prepare meals, perform some household chores that do not require heavy lifting, and takes medication without supervision.

There are some additional inconsistencies in the record that the ALJ did not specifically mention in this context but further support a proper dismissal of Ms. Haney's subjective complaints. First, within weeks after filing for disability benefits in April of 2002, Ms. Haney reported to Dr. Husman that she was actively seeking employment and hoped to obtain a position cleaning hotel rooms as she had done before. Second, no medications were prescribed for physical pain aside from over-the-counter Aspirin. Third, despite claims that anti-depressants aided with her mental conditions, physician progress notes report that Ms. Haney at times did not take her medicine as prescribed. See Gulliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (citing Gowell v. Apfel, 242 F.3d 793, 797 (8th. Cir. 2001)) (noting that deviation from or failure to follow a recommended treatment regimen "weighs against a claimant's credibility"). The record further reflects that, on more than one occasion, during psychological tests, Ms. Haney at times proved to be uncooperative, argumentative, and failed to put forth adequate effort.

The ALJ's credibility determination is supported by substantial evidence on the record as a whole and will not be disturbed. See Jenkins v. Brown, 861 F.2d 1083, 1086 (noting that the ALJ properly applies the Polaski standard when using record inconsistencies to disregard claimant's subjective complaints). A reversal is not warranted "merely because substantial evidence would have supported an opposite conclusion." Peña v. Chater, 76 F.3d 906, 908 (8th. Cir. 1996).

### D. Treating Sources

Ms. Haney claims that the ALJ improperly discounted the opinions of several treating sources, which are consistent with Ms. Haney's subjective complaints of predominantly mental impairments. The Commissioner argues that the ALJ gave valid reasons for attributing less or no weight to such opinions, i.e. not derived from "acceptable" medical sources and internally inconsistent. Furthermore, the ALJ acted within his discretion to accord more weight to the opinions of the state agency medical consultants in light of the record as a whole.

A licensed physician or a licensed/certified psychologist does qualify as an "acceptable medical source" for the purpose of establishing an impairment. 20 C.F.R. § 416.913(a). An ALJ may also consider evidence from "other sources" to demonstrate the severity of a claimant's impairments and consequent effect on one's ability to work. Id. at (d). Therapists, physician's assistants, nurse practitioners, and social workers qualify as such "other sources." Id. "The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors." Shontos v. Barnhart, 328 F.3d 418, 426 (8th. Cir. 2003). A treating source's opinion regarding an applicant's impairment merits controlling weight, provided the opinion is supported by acceptable clinical and laboratory diagnostic techniques and not found to be inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2). An inconsistent opinion of a treating source should receive less deference. Johnson v. Chater, 87 F.3d 1015, 1018 (8th. Cir. 1996) (citing Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

Moreover, a treating source's opinion does not deserve controlling weight when it is reduced to a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements). Although medical opinions on the specific amount or hours of work a claimant can do are permitted and encouraged, treating physicians cannot opine as to whether a claimant can be gainfully employed. Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995). Such conclusions are intended for the vocational expert as they exist "outside the medical province." Id. See also Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (noting that physician statements concerning a claimant's potential for gainful employment do not constitute medical opinions, but opinions on the Social Security Act's application).

Ms. Haney concedes that neither Ms. Kruse, who holds a master's degree,[2] nor Ms. Zaichenko, a certified physician's assistant, meet the definition of an "acceptable medical source." The ALJ ackowledged that Ms. Haney suffers from several mental impairments, but did not find that they were severe enough to meet the listing requirements under 20 C.F.R. § 404, Sbpt. P, App. 1 (as discussed in more detail below). The ALJ recognized that the opinions of Ms. Kruse and Ms. Zaichenko could be considered in determining how impairments impacted Ms. Haney, but justly disregarded the medical source statements that these two treating sources completed. First, medical source statements are properly defined as "medical opinions submitted by medical sources." Soc. Sec. Ruling 96-5p. Neither Ms. Kruse nor Ms. Zaichenko may be considered proper "medical sources." Second, the ALJ noted that the medical source statements involved were comprised of deficient checklists. Three of the four checklists used allowed only for a response of "present" or "absent" with regard to symptoms, indicating that a treating source would be required to check "present" if any limitation, however slight, was perceived. Third, there are internal inconsistencies between treatment progress reports and the ultimate checklist responses provided. For example, even though Ms. Zaichenko characterized Ms. Haney as exhibiting only mild anxiety during one of three visits and appeared stable overall, Ms. Zaichenko checked "present" for all possible anxiety symptoms except one, autonomic hyperactivity. Ms. Zaichenko opined that Ms. Haney suffered from a marked anxiety that severely limits her social functioning, daily activities, as well as concentration when Ms. Zaichenko's treatment notes do not support that degree of limitation.

Ms. Kruse's progress notes generally characterize Ms. Haney as "moody" and "lacking concentration" but of normal psychomotor activity. Yet, Ms. Kruse checked off several marked limitations for Affective Disorders that are not supported by the underlying

[2] The record does not specify the field this advanced degree is held and also fails to indicate that Ms. Kruse is a licensed psychologist.

medical record. Furthermore, when completing the medical source statement for affective disorders, Ms. Kruse checked that Ms. Haney's "symptoms or signs are currently attenuated by medication or psychosocial support" (Tr. 225). The Eighth Circuit Court of Appeals has determined that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Roth v. Shalala, 45 F.3d 279, 282 (8th. Cir 1995) (quoting Stout v. Shalala, 988 F.2d 853, 855 (8th. Cir 1993)).

The ALJ properly discounted a letter signed by social worker Deb Estes, nurse practitioner Grafft, and BHGMHC medical director Dr. Marvin Piburn opining that Ms. Haney suffered from marked restrictions in daily living and social functioning. The ALJ adequately explained his reasoning for discounting the opinion letter: (1) no record evidence exists to confirm that any "acceptable medical source" ever examined Ms. Haney; (2) there are no clinical findings to support the listed symptoms therein that Ms. Haney herself reported; and (3) there are internal inconsistencies. With regard to the inconsistencies, the ALJ pointed to the fact that prior treatment records demonstrate that the extent of symptoms (i.e. auditory hallucinations, sleeplessness, etc.) were alleviated somewhat when Ms. Haney took her prescribed medication. Just two days before this joint letter was tendered, the BHGMHC was informed that Ms. Haney had been non-cooperative and failed to take her medications. And although the Black Hawk staff members further opined that Ms. Haney would be unlikely to successfully engage in gainful employment, the ALJ need not consider such contentions as they "'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th. Cir. 2002) (quoting Cruze v. Chater, 85 F.3d 1320, 1325 (8th. Cir. 1996)).

The ALJ acted within his discretion by according greater weight to "acceptable medical sources" like the state agency medical consultants in this case, i.e. Dr. J.D. Wilson, who opined that Ms. Haney is capable of work. The ALJ has the right to consider opinions of state agency medical consultants because they are not just physicians, but also

experts in the field of Social Security law.  See 20 C.F.R. § 404.1527(f)(2).  This fact coupled with the opinions of "acceptable medical sources" like Dr. Nicknish who conducted a normal physical and neurological examination of Ms. Haney further supports the ALJ's initial determination.  In turn, Dr. Husman described Ms. Haney's jugdment and insight as fair and despite a diagnosis of major depressive disorder, Dr. Husman's progress notes detail how Ms. Haney admitted that she felt capable of working.  Dr. Hall's overall evaluation of Ms. Haney's mental capacities, as described earlier, is incompete as an accurate assessment due to Ms. Haney's minimal cooperation with the tests.

Ms. Haney ultimately points to Dr. Samo's testimony as a strong indicator that she is indeed disabled due to mental illness because, unlike Ms. Zaichenko, Kruse, and others, Dr. Samo meets the criteria as an "acceptable medical source."  However, Dr. Samo's evaluation notes confirm that Ms. Haney does better when medicated.  When seeing Ms. Haney after an alleged hospitalization for suicidal thoughts, Dr. Samo did not suggest any change in medication.  Although the ALJ did not elucidate his reasons for disregarding the opinions of various treating sources with a great deal of specificity, in light of the evidence on the whole, this court independently concludes that there exists substantial evidence to support his decision regarding the relative weight of treating source opinions invovled.

Ms. Haney also argues that she meets the listings outright for Affective Disorders (12.04), Anxiety (12.06), and Personality Disorders (12.08) in accordance with 20 C.F.R. § 404, Subpt. P, App. 1.  Ms. Haney points to medical records from many mental health professionals, including but not limited to consulting examiners, to substantiate her disability claim.  The Commissioner argues that the many record inconsistencies support the ALJ's determination that Ms. Haney's impairments, though severe, did not rise to meet the listing level.

The ALJ found Ms. Haney to suffer from severe impairments including major depressive disorder, a history of social phobia, personality disorder, a history of

polysubstance abuse, and allegations of medically determinable impairments resulting in complaints of left sided arm and leg numbness with pain, back pain, and numbness of the hands and feet (Tr. 16). The ALJ applied the special evaluative technique described in 20 C.F.R. § 416.920a and determined that, in light of the numerous record inconsistencies, Ms. Haney has mild restrictions of daily living activities, moderate difficulties in social functioning, mild to moderate difficulties maintaining concentration, persistence, or pace and there is no evidence of decompensation (Tr. 22). Ms. Haney looks to the medical source statements of treating sources Zaichenko and Kruse to substantiate her claim that she meets listing requirements. However, "determining whether an individual's impairment reaches listing level is not an issue in which the opinion of a treating source is given controlling weight." Randolph v. Barnhart, 386 F.3d 835, 840 (8th. Cir. 2004) (citing 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)). In fact, such treating source opinions "on issues reserved to the Commissioner will never be given controlling weight." Soc. Sec. Ruling 96-5p.

The vocational expert's identification of available jobs in the national economy together with the ALJ's approach in determining that Ms. Haney's impairments do support the RFC provided.

### E. Consideration of Additional Evidence

Ms. Haney argues that the Appeals Council failed to properly consider some additional 2005 medical records of Dr. Paul Samo submitted to it after the ALJ's decision. Even though Ms. Haney concedes that the Appeals Council did make the new evidence a part of the record, Ms. Haney further contends that a proper review of this treating physician's opinion would have supported a finding of disability. The Commissioner argues that the Notice of Appeals filed on May 19, 2005, expressly states that any additional evidence listed on the Order of Appeals Council (which included the records from Dr. Samo) together with Ms. Haney's reasons for disagreeing with the ALJ's decision were considered and do not provide a basis for changing the decision (Tr. 6, 9).

It is settled law in the Eighth Circuit Court of Appeals that this court "may only review the ALJ's final decision, not the Appeals Council's non-final administrative decision to deny review." Browning v. Sullivan, 958 F.2d 817, 822 (8th. Cir. 1992) (citing 20 C.F.R. § 404.981). However, once the Appeals Council receives and considers new evidence, it is the duty of this court then to establish "whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." Richmond v. Shalala, 23 F.3d 1441, 1444 (8th. Cir. 1994) (quoting Nelson v. Sullivan, 966 F.2d 363, 366 (8th. Cir. 1992)). This court agrees that the record offers substantial evidence to validate the ALJ's decision, particularly in light of the fact that Ms. Haney's limitations are ameliorated somewhat through pharmacotherapy.

Ms. Haney further argues that additional medical evidence attached to her March 24, 2005 brief letter submitted to the Appeals Council is missing from the transcript. The September 30, 2003 records in question comprise seven pages of clinical findings completed by Ms. Debra Estes, LISW, of the BHGMHC. In accordance with 20 C.F.R. § 416.1470, any new and material evidence relevant on or prior to the ALJ decision date shall be considered by the Appeals Council. However, this court has reviewed the missing intake interview records and concludes that remand for review would not be necessary. Although the treatment notes are during the appropriate time frame, Ms. Estes is not an "acceptable medical source" and much of the information reported therein is cumulative in nature.

Similar symptoms, i.e. lack of concentration, depression, crying spells, sleeplessness, are perhaps presented as more severe but Ms. Haney admitted to being off of her medications at the time. This new evidence bolsters the ALJ's initial credibility determination of Ms. Haney and the Dr. Samo records in question show that she not only failed to take prescription drugs that help alleviate symptoms, but denied a history of substance abuse despite past alcohol and cocaine treatment programs, and also denied ever being in special education classes which is inconsistent with other record evidence.

## F.  Improper Hypothetical Question

Ms. Haney argues that the hypothetical relied upon by the ALJ in determining that she could return to the workforce was improper because it relied on an incomplete mental RFC that failed to completely describe her mental impairments and therefore cannot constitute substantial evidence.  Specifically, Ms. Haney argues that the ALJ did not cover the following limitations in the hypothetical upon which he ultimately relied: (1) inability to complete a normal workday without psychological interruptions; (2) inability to follow and maintain a schedule or regular attendance; (3) inability to accept instructions or respond to criticism; and (4) inability to maintain socially appropriate behavior.  As such, Ms. Haney contends that this matter should be reversed and possibly remanded for further proceedings.  The Commissioner argues that the ALJ's limitations regarding Ms. Haney's abilities were based solely on the degree to which those impairments were accepted as credible.  The medical source statements and extent of subjective allegations on which Ms. Haney relies were discredited by the ALJ.

An improper hypothetical cannot serve as substantial evidence.  <u>Whitmore v. Bowen</u>, 785 F.2d 262, 263-64 (8th Cir. 1986).  The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform.  <u>Newton v. Chater</u>, 92 F.3d 688, 694-95 (8th Cir. 1996).  However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue.  <u>See</u> <u>Long v. Chater</u>, 108 F.3d 185, 188 (8th Cir. 1997).  "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician."  <u>Id.</u> (citing <u>Henderson v. Sullivan</u>, 930 F.2d 19, 21 (8th Cir. 1991)); <u>Baker v. Apfel</u>, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and

restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As set forth above, the ALJ's hypothetical question properly included only those mental impairments which were supported by substantial evidence. The ALJ is not required to reiterate the several record inconsistencies that resulted in a determination of reduced credibility concerning Ms. Haney's subjective complaints or a rejection of improper medical source statements. Furthermore, a proper hypothetical question serves as substantial evidence when it "capture[s] the concrete consequences of a claimant's deficiencies" which the ALJ accepts as true. Pickney v. Chater, 96 F.3d 294, 297 (8th. Cir. 1997). Here, the ALJ assumed in his hypothetical that Ms. Haney suffered from serious depression, etc., and offered the following RFC:

> She is able to do only simple, routine, repetitive work that does not require constant close attention to detail or maintaining attention and concentration or detailed matters for extended periods of time. She can have no constant contact with the public, coworkers, and/or supervisors, however she does require occasional supervision. She should not work at more than a regular pace, and that's using three speeds of pace being fast, regular, and slow. And she should not work at more than a mild to moderate level of stress.

(Tr. 344). Thus, the ALJ explicitly states the mental conditions that cause deficiencies and incorporates the resultant practical ramifications. The ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Roe v. Chater, 92 F.3d 672, 676 (8th. Cir. 1996) (noting that a vocational expert's hypothetical that employs terms like "occasional supervision" can capture the concrete consequences of larger "deficiencies of concentration, persistence, and pace"). This court finds that the hypothetical question posed to the vocational expert was proper in form as it included the practical consequences of those mental limitations that the ALJ accepted as true. The vocational expert determined that Ms. Haney could perform several unskilled jobs that are available in the national economy: kitchen helper,

assembler, and laundry sorter (Tr. 345).  The ALJ's decision to reject the extent of certain mental impairments will not be reversed.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

June 27, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT